**SO ORDERED.**

**SIGNED this 16 day of February, 2007.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LELAND LEON SHAPLAND, | ) | Case No. 05-11637 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PATRICIA A. SHAPLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 05-5611 |
| | ) | |
| LELAND LEON SHAPLAND, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Plaintiff Patricia A. Shapland (hereafter "Patricia") filed this adversary proceeding seeking

an order denying defendant Leland Leon Shapland (hereafter "Leland") a discharge in this case

under various provisions of 11 U.S.C. § 727(a) or, alternatively, excepting from Leland's discharge

1

his property settlement debt to her. Patricia appeared in person and by her counsel, Roger Hughey. Leland also appeared at trial and through his counsel, N. Trip Shawver. The Court conducted a trial on October 24, 2006 and, after hearing the witnesses' testimony, reviewing the exhibits and receiving and reviewing the parties' respective memoranda, issues these findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52.

Jurisdiction

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157 (b)(2)(J).

Introduction

Patricia asserts a general objection to Leland's discharge based on three subsections of 11 U.S.C. § 727(a). First, she contends that Leland has taken, transferred, or concealed property with the intent to hinder, delay, or defraud his creditors within one year of the date of filing of his case, March 30, 2005.[1] Second, she avers that Leland has concealed, falsified or destroyed financial records.[2] Third, she argues that Leland has made false oaths in the course of the case.[3] Should the Court not deny Leland a discharge, Patricia states that Leland's property settlement debt to her should be excepted from his discharge under 11 U.S.C. § 523(a)(15).

Nature of Patricia's Debt and Claim

Patricia's claims arise out of a divorce judgment entered in Grant County District Court on September 16, 2003 and affirmed by the Kansas Court of Appeals on November 19, 2004. In a

---

[1] 11 U.S.C. § 727(a)(2)(A).

[2] 11 U.S.C. § 727(a)(3).

[3] 11 U.S.C. § 727(a)(4)(A).

2

thorough and well-reasoned opinion, the Honorable Tom R. Smith found that Leland and Patricia had been married for 27 years and, in that time, had amassed a substantial and complex farming operation that the court was required to divide under Kansas law. The farm operation consisted of over 2,000 acres of land owned and rented by Leland and Patricia along with a sizeable custom-farming operation. Both the land and the debtor's line of equipment was financed by the Garden City Production Credit Association ("PCA"). Patricia filed her divorce petition in Grant County in August of 2002 and when the PCA's notes came up for renewal in March of 2003, she declined to co-sign them. This resulted in PCA calling the notes and liquidating the operation. With the loss of the farming assets, Leland was forced to take other measures to make his living.

After a careful review of the numerous assets and liabilities of the parties, Judge Smith awarded Patricia spousal maintenance of $1,200 per month for 60 months and $600 per month for the next 60 months for a total of $108,000, attorney's fees of $15,000 and a property division/equalization payment of $226,000 payable in semi-annual payments of $11,300 on July 1 and December 31 over ten years, without interest.[4] If Leland defaulted on any of these payments, interest at the Kansas judgment rate would accrue. As set forth in Patricia's proof of claim, she claims in respect of property, attorney's fees and accrued interest $294,899.77.[5] This amount includes $27,894 that Leland owes Patricia because, in defiance of Judge Smith's specific orders, he failed to repay a debt to Golden Plains Credit Union ("GPCU") that was secured by a certificate of deposit set over to Patricia under the divorce decree. When Leland refused to pay this debt, GPCU seized the CD. Leland was held in contempt and incarcerated. Leland made no payments

---

[4] Ex. 34.

[5] Ex. 63.

Case 05-05611    Doc# 25    Filed 02/16/07    Page 3 of 13

on the $226,000 equalization obligation. Patricia is also owed $63,600 in spousal maintenance due or to come due from and after October 18, 2006. It appears from the evidence that Leland has made timely payments on the spousal maintenance obligation.

Leland's Post-Divorce Conduct

To say that Leland has actively resisted paying his debt to Patricia would be an understatement. As set forth below, he has taken numerous measures to prevent her from collecting her equalization payment and, it appears, has done so in the fervent wish that she collect nothing whatever from him over and above the spousal maintenance claim. The Court refers to a few glaring incidents below in an effort to illustrate the depth of Leland's fervor.

In his ruling, Judge Smith ordered Leland to turn over a New York Life insurance policy valued at $12,562 to Patricia. In addition, the decree set over to Patricia a certificate of deposit at GPCU in the amount of $58,681. The parties had a debt of $26,190 secured by the CD and Leland was ordered to pay the debt or take other measures to effect the CD's release by GPCU.[6] Instead, Leland cashed the policy in and spent the funds. This occurred on March 16, 2004 when Leland liquidated the policy and deposited the proceeds into an account he had opened in Walsh, Colorado, for the admitted purpose of evading Patricia's efforts to collect her judgment.[7] On January 28, 2005, Judge Smith conducted a contempt hearing and found that Leland had violated the divorce decree's order because he liquidated the policy and because he had failed to negotiate with GPCU in good faith.[8] Judge Smith stayed imposition of sentence on the contempt finding until March 15, 2005 so

---

[6] Ex. 34.

[7] Ex. 24.

[8] Ex. 36

4

that Leland could repay the debt. He did not and, on March 15, 2005, Leland was incarcerated according to Judge Smith's order of that date.[9] Leland filed a notice of appeal from the March 15 order, but did not perfect the appeal and Kansas Court of Appeals dismissed it. Only after being released from jail did Leland repay to Patricia the proceeds of the New York Life policy, and then only in the form of repayment of the note at GPCU.

Commencing on or about March 29, 2004, Leland transferred his banking activities from his former depository, Western State Bank ("WSB") in Ulysses to other institutions. He maintained a $1 balance in the WSB account #794 under the name of "No Gotta Ranch."[10] Only government payments and one other deposit passed through that account through November of 2004. Needing banking services, Leland passed substantial amounts of money through a new account in his name opened at the Colorado State Bank ("CSB") of Walsh, Colorado commencing in April of 2004, well within the one-year lookback in § 727(a)(2). Leland testified he did so to keep creditors from attaching his accounts. Specifically, he admitted that he moved his banking across state lines because he had heard rumors that Patricia would garnish his Ulysses account. Leland purchased cashier's checks to pay his monthly alimony payments to the Kansas Payment Center so that no one could trace any of his checks to the CSB funds. It appears that Leland paid all of his personal expenses, as well as some operating expenses, from the CSB account.

In November of 2004, Leland took a further step to conceal his banking activities from his creditors and specifically from Patricia. On November 5, he deposited nearly $24,000 into an account held by Larry Smith at WSB, again for the admitted purpose of evading his creditors'

---

[9] Ex. 37.

[10] Ex. 23.

5

grasp.[11]    While this account was in Smith's name, Leland had signing authority on the account. The credits in this account represented Leland's money and he signed all checks on this account. Leland told Smith he was having problems with creditors garnishing his accounts and needed an account in which he could safely put his money.

Mr. Smith and Leland are or were partners in several businesses.  In August of 2003 (while the divorce was pending), Smith "loaned" Leland $51,275 to repurchase or finance Leland's purchase of some of the Shapland equipment offered at auction by the PCA.[12]  That arrangement morphed into a "lease" pursuant to which Smith purchased certain of Shaplands' equipment and leased it to Leland.  These leases are memorialized on "Rental Agreements" apparently copied from extension service forms for farm leases – all the agreements refer to real estate and personal property.[13] Leland entered into a similar arrangement with Dew Farms.  On April 6, 2004, Leland transferred his interest in the Smith and Dew "leases" to Danny Alexander d/b/a Triple A Ranch.[14] On April 30, Leland and Alexander amended the agreements to provide that, in lieu of rent, Triple A would pay Leland's equipment payments to Case, Agco and John Deere Credit.  At or about the same time, Leland was employed by Mr. Alexander, ostensibly operating the "leased" equipment. Leland also sold his share of a partnership known as Hot Seats to his partners, Galen Nichols and Charles Walters, in December of 2004.

When his counsel asked him whether he intended to conceal anything from Patricia by

---

[11]  Ex. 22.

[12]  Ex. 10.

[13]  Exhibit 4.

[14]  Exhibits 6 and 7.

6

adopting these exotic banking practices, Leland stated variously that he would have told Patricia this information if she had conducted a hearing in aid of execution or that his payees knew that he was using the CSB account. When his counsel asked him about certain inaccuracies or inconsistencies on his tax returns, Leland stated that he relied on his accountant to prepare the returns which he unquestioningly signed.

Perhaps most compelling are several instances where Leland expressed his intentions toward Patricia and his divorce obligations. On various occasions, Leland told others that he'd go broke himself before paying Patricia a dime of the judgment. Judy Cornell, a friend of the Shaplands, testified that she ran into Leland while the divorce case was pending in 2003 and that he told her "he'd break them both" before he paid Patricia anything. Even more persuasive is the deposition testimony of Wesley Shapland, Leland and Patricia's son, who stated that he conversed with his father over a period of time from November of 2005 through January of 2006 and that Leland repeatedly told him he would "do what he could" to see that Patricia received nothing on account of the judgment. Leland himself testified that Patricia's refusal to sign the PCA renewal notes animates his desire to thwart her collection efforts.

<u>Leland's Bankruptcy History</u>

After receiving the Grant County District Court's divorce decree and perfecting his appeal thereof to the Kansas Court of Appeals, Leland filed a chapter 13 in this court.[15] By filing this chapter 13 case, Leland secured a no-cost stay of execution pending his appeal. This judge was assigned Leland's case and recalls that the matter was hotly contested. Because it was a chapter 13 case, Leland's discharge was not an issue, but his having proposed a chapter 13 plan in good faith

---

[15] *In re Leland Shapland*, Case No. 03-16793 filed on December 16, 2003.

was. A final pretrial order on confirmation and the related issues was entered by this Court on October 4, 2004, but when the case was called for trial on October 19, 2004, the parties announced that the debtor wished to dismiss the case.[16] On November 10, 2004, Leland's then bankruptcy counsel filed a notice of attorney's lien against whatever funds the trustee would have distributed under 11 U.S.C. § 1326. In the same time frame, November of 2004, Leland began diverting his funds into the Larry Smith WSB account discussed above. On Leland's 2004 tax return he reports on Schedule F, Statement 5, paying a "professional" $12,900.[17] This is not reflected on his Statement of Affairs filed in connection with the present bankruptcy, but Leland did testify that he paid this money to his prior chapter 13 counsel.

The Kansas Court of Appeals issued its opinion affirming the Grant County District Court's divorce decree on November 19, 2004.[18] In the current case filed March 30, 2005, Leland filed schedules and a statement of financial affairs ("SOFA") that were not complete or accurate. He admitted that his answer to question 3 of the SOFA failed to disclose $5,000 paid to his counsel, Mike Kimball. Nor did he disclose that the chapter 13 trustee was in possession of funds in connection with his dismissed, but not yet closed, chapter 13 case. SOFA question 10 requires the disclosure of any non-ordinary course sale of assets occurring within one year of the date of filing. Leland omitted the sale of a tractor in response to this question. He also neglected to list the sale of several business entities in which he had an interest in response to the same question. In fact, he had sold his interest in the Hot Seat Partnership in December of 2004, just three months beforehand.

---

[16] An order denying confirmation and dismissing the case was entered October 21, 2004.

[17] Ex. 11.

[18] Ex. 35.

8

In similar evasive fashion, Leland did not disclose on Schedule B his stock in GMA, Inc. or Sliced Right, Inc. He had listed both in his chapter 13 schedules in 2003. Nor did he disclose these business associations in response to SOFA question 18. He also failed to disclose his Exxon oil royalty, his belt buckle collection or his hog oiler collection on his schedules. His only excuse for this failing is that he was incarcerated when he filed the present case and that his ability to assist his attorney was therefore somewhat limited.

Parties' Respective Means

Leland asserts that he cannot pay Patricia's debt and, even if he can, she would suffer less detriment if the debt were discharged than he would if he were forced to pay some or all of it. The following findings of fact bear on the Court's determination, if necessary, whether the divorce debt should be discharged under § 523(a)(15).

Patricia has been employed by the Farm Service Administration at the local office in Ulysses, Kansas for over 20 years. According to her pay stubs, at the time of trial, she received bi-weekly net income of $707 after deductions of about $200 for the Thrift Savings Program (a 403b retirement program for federal employees) and $13.28 for the Federal Employee Retirement System ("FERS"), her federal pension. She is also repaying $335 per month on loans from her TSP account. Her gross salary is currently $43,308 a year. Patricia was 50 years old at the time of trial and is eligible to retire from government service at 59.5 years of age. She would receive a pension of about $1,000 per month if she did so.

Patricia submitted her monthly income and expenses on a Schedule I and J form. According to her Schedule I, she had a total monthly income of about $2,614, which includes the $1,200 alimony she receives from Leland. Her schedule J reflects expenditures of about $2,600, leaving a $14 surplus. Patricia lives with her companion Ron Craft. She provided his income and expenses

9

in similar format. Ron is retired and a pensioner who receives about $2,882 a month income and has expenses of about $2,707, leaving him a surplus of $175. Between Ron and Patricia, they have a monthly surplus of $189. They share a vehicle, but Patricia pays for its fuel and upkeep. They live in Ron's home and he makes the house payments. Patricia pays her son's student loan payment of $197 per month. By far, Patricia's greatest expenses are the repayment of the loan secured by her CD and payments to her lawyers. Ron's and Patricia's living expenses do not seem extravagant. Patricia and Ron appear to be in a committed relationship, but do not plan to marry. Accordingly, Patricia has no legal basis to rely upon Ron for support.

Leland's income and expenses are very spare. He now resides in a trailer north of Ulysses and pays rent that he expects to increase to $500 per month. His Schedule I filed in 2005 reflected average net "business" income of about $2,952 per month and expenses of $13,853. No records supporting the claimed farm operating expenses have ever been produced. It appears to the Court that Leland has inserted gross business income on Schedule I and placed business expenses on Schedule J, making it difficult to compare his situation to Patricia's. He submitted an exhibit in which he reported 2005 income of about $11,275 and his 2005 income tax return reflects of farming loss of $15,000. He estimates that he receives about $2,548 per month as a farm worker for his brother Kevin and has negative disposal income of <$223> per month after expenses. He does have a $98,000 IRA that was set over to him in the divorce case and is exempt. He believes that he has no future economic prospects because he has lost all of his land and equipment to conduct farming operations.

Analysis

Patricia objects to Leland's discharge, asserting that he has transferred or concealed assets within one year of the petition date with the intent to hinder, delay or defraud a creditor as provided

10

by § 727(a)(2)(A).  In order to prevail, Patricia must show by a preponderance of the evidence that Leland transferred, removed, or concealed assets with the intent to hinder, delay or defraud.[19]  In addition, she asserts that Leland has failed to keep accurate records under § 727(a)(3) and that he has made false oaths in this case in contravention of § 727(a)(4)(A).

The transfer/concealment aspect of this case is the most incriminating to Leland.  The Tenth Circuit Bankruptcy Appellate Panel has cited the following factors from which a debtor's fraudulent intent may be inferred: (1) concealment of pre-bankruptcy conversions of assets; (2) conversion of assets immediately before filing bankruptcy; (3) gratuitous transfers of property; (4) continued use of transferred property; (5) conversion after entry of a large judgment against debtor; and (6) engaging in a pattern of sharp dealing prior to bankruptcy.[20]  Leland has made no secret of his defiant attitude toward Patricia and his utter disregard for her legal rights under the Grant County divorce decree.  His conduct amply demonstrates that attitude.  He served time in jail rather than comply with the domestic court's orders.  He has virtually no explanation for transferring his bank accounts to Walsh, Colorado, other than his desire to keep them out of his creditors' sight.  There is no satisfactory explanation for Leland running money through the Larry Smith account.  If there were any doubt, Leland's continuing practice of buying a WSB cashier's check with his Walsh account in order to pay his alimony obligation suggests a measured contriving to divert Patricia from the trail of his assets.

Even more compelling, this is one of those rare cases where the Court is presented with direct evidence of a debtor's intent to hinder, delay or defraud Patricia.  Indeed, Leland has gone so

---

[19]  *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997).

[20]  *The Cadle Company v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (10th Cir. BAP 2001).

far as to tell their son that he will go broke before Patricia collects a dime. He expressed similar sentiments to friends. He admitted that he moved his bank account across state lines to avoid potential garnishment of his Ulysses account by Patricia. The Larry Smith account was set up to funnel and protect Leland's funds from creditors. Leland controlled all activity in this account and signed all checks drawn on this account. All of this is sufficient evidence to find that Leland has, within the year preceding the filing of the case, concealed assets from Patricia with the intent to hinder, delay or defraud her.

As noted within, he has made a number of other transfers, some within, and some without the one-year look-back period. Even though the transaction involving the New York Life policy did not occur within the one year period, it indicates his continuing bad intent toward Patricia. His transfer of the "leases" to Triple A and Larry Smith's entities did occur within the one year period and also appear calculated to secrete his business interests from her. This Court has no difficulty finding that Leland should be denied a discharge under § 727(a)(2)(A).

Leland's numerous schedule and SOFA omissions, all either unexplained or blamed on some other person, similarly support the Court's conclusion that he should be denied a discharge for failing to keep accurate records and for making false oaths in connection with this case. To prevail on the false oath count under § 727(a)(4)(A), Patricia must show that Leland knowingly and willfully, with intent to defraud, made a false oath concerning a material fact.[21] The information is material if it concerns the existence and disposition of the debtor's property.[22] The numerous inconsistencies between the schedules and statements he filed in his two bankruptcy cases and his income tax returns leave no other alternative conclusion. Creditors are not compelled to conduct

---

[21] *Job v. Calder (In re Calder)*,907 F.2d 953, 955 (10th Cir. 1990).

[22] *Id.*

an extensive investigation of the debtor's assets and transactions, but rather may rely upon the information provided in the bankruptcy pleadings and schedules.[23]

Finally, with the above conclusions that Leland should be denied a discharge on the § 727 grounds set forth above, the Court need not reach or assess whether Leland's divorce obligations to Patricia should be excepted from discharge under § 523(a)(15). The Court stresses that the balance of financial distress here is fairly equal and, were there no bases for Patricia's general objection to discharge, the Court might be inclined to consider some result favorable to Leland. But his conduct post-divorce and pre-bankruptcy simply prevents that and requires that no discharge be granted in this case.

JUDGMENT should therefore be entered for Patricia on her complaint SUSTAINING her general objection to Leland's discharge under § 727(a)(2)(A), (a)(3), and (a)(4)(A). In light of that determination, Patricia's cause of action under § 523(a)(15) is MOOT. A Judgment on Decision will issue this day.

# # #

---

[23] *Id.* at 956.

13